**REPUBLIC SYSTEMS AND PRO-GRAMMING, INC.**

v.

**COMPUTER ASSISTANCE, INC., Computer Assistance of Hartford, Inc., Andrew N. Vignola, and Roger Geddes.**

**Civ. No. 13586.**

United States District Court,
D. Connecticut.

Jan. 15, 1970.

S. Robert Jelley, Wiggin & Dana, New Haven, Conn., for plaintiff.

William J. Secor, Jr., Donald McPartland, Upson, Secor, Greene & Cassidy, Waterbury, Conn., for Computer Asst. of Hartford, Inc. and Andrew Vignola.

Lewis Segal, Donald Richter, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for Computer Asst., Inc.

Richard P. Zipoli, Jeremiah M. Keefe, Waterbury, Conn., for N. Roger Geddes.

## RULING ON APPLICATION FOR PERMANENT INJUNCTION

BLUMENFELD, District Judge.

In this diversity action, plaintiff seeks damages for and an injunction against allegedly unlawful conduct of two former employees, the competing corporation those former employees organized following their resignation from plaintiff's employ, and another competing corporation, already in existence at the time the events complained of here occurred. Plaintiff complains of the following allegedly unlawful conduct by the defendants: (1) approaching plaintiff's customers to induce them to terminate their contracts with plaintiff and to transfer the work contracted for to defendants; (2) soliciting and inducing plaintiff's employees to resign from plaintiff's employment and enter defendants' employ, and thereafter to refuse to revoke their resignation and return to plaintiff's employ; (3) taking from plaintiff's files documents relating to prospective business and work in progress; (4) appropriating to themselves plaintiff's business and good will.

On December 12, 1969, a temporary restraining order was issued prohibiting defendants from (1) approaching any of plaintiff's present customers for whom plaintiff had work in progress under contract and attempting in any way to induce them to terminate their contracts with plaintiff and transfer the work to defendants; (2) soliciting or inducing any of plaintiff's employees to disclose any information concerning work in progress or prospective business; (3) disclosing any information concerning work in progress or prospective business; (4) soliciting or inducing any of plaintiff's employees to resign from

plaintiff's employment; (5) soliciting or inducing any of plaintiff's former employees to refuse to revoke their resignation from plaintiff and to refuse to return to plaintiff's employment; (6) engaging directly or indirectly in unfair competition with plaintiff "in the manner complained of in plaintiff's complaint."

An order to show cause why a preliminary injunction should not issue was filed simultaneously, and a hearing was set for December 19. By agreement of counsel, the hearing on a preliminary injunction was consolidated with the hearing on a final injunction, with only the issue of damages being reserved. At the conclusion of that hearing, defendants having consented, the temporary restraining order then in effect, with the exception of one paragraph, was extended until January 15, 1970. The scope of the permanent injunction sought by plaintiff is somewhat broader than the terms of the temporary restraining order now in effect.

For the reasons set forth more fully herein, the temporary restraining order is dissolved and the applications for preliminary and permanent injunctions are denied.

## FINDINGS OF FACT

1. Plaintiff, Republic Systems and Programming, Inc., is organized under the laws of Texas and has a principal place of business in New Jersey. Defendants Vignola and Geddes are citizens of Connecticut and defendants Computer Assistance, Inc. and Computer Assistance of Hartford, Inc. are Connecticut corporations with principal places of business in Connecticut.

2. The amount in controversy exceeds $10,000, exclusive of interest and costs.

3. The business of all the parties may be generally described, as it was by various witnesses, as the data processing services business or the computer software business. In general, the parties are engaged in analyzing problems which might be solved by the use of computers and other data processing equipment, designing a solution to those problems, and implementing the solution by the use of computer programs on the premises of the client, who in most cases would already own a computer.

4. The computer software or data processing services business is relatively new and rapidly expanding. One of its most salient characteristics is the fierce competition for new business and, of special relevance here, for technically competent personnel.

5. Perhaps because of the keen competition for technically qualified personnel, it is not uncommon for those in this field to move frequently from one employer to another, developing in some instances more loyalty to the industry and to the customers than to their employers.

6. Plaintiff Republic Systems, in addition to its home office in East Orange, New Jersey, has branch offices in Secaucus, New Jersey, and Cheshire, Connecticut, the latter being established in 1967.

7. Defendant Andrew Vignola was, prior to December 5, 1969, assistant vice-president of plaintiff and manager of plaintiff's Cheshire office, in charge of the day-to-day operation of plaintiff's business at that office.

8. Defendant Roger Geddes was, prior to December 5, 1969, senior staff manager of plaintiff's Cheshire office, with general supervisory authority over the "technical" staff members there.

9. Prior to December 5, 1969, there were, including defendants Vignola and Geddes, approximately 25 employees at plaintiff's Cheshire office. Among the other 23 were 3 staff managers, 2 account managers, 13 technicians, 2 marketing managers, and 1 full-time and 2 part-time secretaries.

10. None of plaintiff's officers and none of its employees at the Cheshire office was bound by an employment contract.

11. In addition to the plaintiff's 3 branch offices listed above, there were at one time 2 other branches, 1 located in New Hampshire and 1 in Old Green-

wich, Connecticut, both organized in late 1968.

12. Sometime in March 1969 plaintiff's New Hampshire and Old Greenwich offices were closed for lack of business.

13. At approximately the same time, March of 1969, defendant Vignola held a meeting at his home attended by defendant Geddes and the three staff managers. At that meeting, the financial straits of plaintiff were discussed, as were alternatives to remaining in plaintiff's employ. Specifically the possibility of leaving plaintiff to form a new company was explored. The discussion included the possibility of asking some of plaintiff's other employees to join them and of securing the business of some of the plaintiff's then present customers.

14. In April of 1969 defendant Vignola again chaired a meeting at his home, this time with defendant Geddes, two of the three staff managers and one of the two marketing managers present. The decision was made to leave the plaintiff and form a new company. A week later, the participants were notified that the whole thing was off.

15. In May of 1969, following these two meetings, Mr. Vignola went to plaintiff's home office in New Jersey to submit his resignation to plaintiff's president. He was unhappy with the company and its performance. After gaining some concessions from plaintiff's president, however, Vignola agreed to stay on at his position. It was agreed that the Cheshire office would become a separate corporation, a wholly owned subsidiary of plaintiff, and that defendant Vignola would be an officer, director, and shareholder in the new company. Some steps were taken to initiate that reorganization, but many more which were contemplated had not been taken by December 5, 1969, when the conduct complained of in this action occurred.

16. Defendant Computer Assistance, Inc. had for some time been a competitor of plaintiff Republic Systems and Programming, Inc. in the computer software business.

17. Sometime in early November 1969 Mr. Thomas McDonagh, president of defendant Computer Assistance, Inc., acting pursuant to rumors of unrest in plaintiff's organization, called defendant Vignola at the latter's home to feel him out as to the extent of his dissatisfaction and as to the chances of getting him to come with Computer Assistance.

18. McDonagh's telephone call precipitated an extended series of further conversations and meetings between him and Vignola at various locations through the balance of the month. The early conversations might be described as cautious, exploratory, boasting sessions. Later they developed into more substantive discussions of the means by which Vignola might in some capacity join forces with McDonagh if and when he were to leave plaintiff.

19. Among the relevant points of discussion were: (a) Vignola's compensation for joining McDonagh; (b) the possible forms their alliance might take, including (i) installation of Vignola as president of a subsidiary of defendant Computer Assistance, Inc.; (ii) employment of Vignola directly as an employee of McDonagh's, or (iii) formation by Vignola of his own corporation, which would then be merged with Computer Assistance, Inc.; (c) the name of Vignola's separate corporation, if one were to be formed; (d) indemnification by McDonagh of legal expenses incurred by Vignola in the event of suit by plaintiff; (e) the employees of plaintiff Republic's Cheshire office and whether and how they could fit into McDonagh's organization; and (f) Republic's clients and whether Vignola could bring their business to Computer Assistance.

20. At some point late in November, Vignola informed defendant Geddes that he was thinking of leaving plaintiff. Geddes was invited to and did attend the meeting between Vignola and McDonagh on December 1, 1969. His proposed role as a technical manager in McDonagh's organization was discussed. Two of McDonagh's top assistants also joined the discussion group at that point.

21. Prior to the December 1 meeting, attorneys for both Vignola and McDonagh were informed of the pending discussions. They attended the November 26 meeting of the principals and were thereafter active in working out the details of the proposed alliance.

22. In addition to the introduction of defendant Geddes, the December 1 meeting was devoted to organizational problems and the accommodation, without prejudice, of whichever Republic employees chose to follow Vignola and Geddes in resigning from Republic and joining McDonagh's group.

23. On December 3, 1969, Vignola made a final decision to leave plaintiff's employ. That day he informed McDonagh of his decision and that he would probably leave on December 5. He also informed his attorney of his decision and requested the latter to proceed with drafting papers for a new corporation, to be known as Computer Assistance of Hartford, Inc. Curiously, Mr. McDonagh, director, president, and major stockholder of Computer Assistance, Inc., approved of Vignola's use of the obviously similar name, even though at that time there was no agreement to merge the two corporations. Vignola's attorney was also instructed to draft a "merger agreement."

24. On the morning of Friday, December 5, 1969, Vignola picked up the incorporation papers prepared by his attorney, mailed his letter of resignation to plaintiff's president in New Jersey, and went to Republic's office in Cheshire where he found and informed Geddes of his actions. Geddes, who was listed as secretary of the new corporation, readily agreed to resign and join the new venture.

25. The incorporation papers of defendant Computer Assistance of Hartford, Inc. were filed on December 5, 1969.

26. On the afternoon of December 5 and over the weekend, Vignola, Geddes, and their top lieutenants contacted substantially all of plaintiff's Cheshire employees, offered each a job with defendant Computer Assistance of Hartford, Inc. at a salary slightly higher than each was receiving at Republic, and successfully recruited nearly all. The other employees joining the movement agreed to submit their resignations by mail to the home office in New Jersey.

27. At least one of the reasons for choosing the mails to communicate their resignations was to allow time for recruitment of all of plaintiff's employees before plaintiff's president was informed of the situation and could attempt to counteract the efforts of the Vignola group.

28. On the evening of December 5, Vignola and McDonagh executed an agreement to merge their two corporations. The agreement also included terms of compensation for Vignola.

29. On Sunday evening, December 7, plaintiff's president was informed by one of the wavering employees that Vignola had resigned and taken most of the staff with him. He received the letters of resignation in the mail the following day.

30. Of the original 25 employees at plaintiff's Cheshire office on December 4, only five remained by December 9.

31. On Monday, December 8, Vignola and others of his group began to contact customers of Republic for whom they had been doing work at the time of their resignations (or for whom work had been done in the past on a warranty basis). Each of the customers with work in progress was told of the resignations but assured that in one way or another his particular project would be completed by the people who had been working on it as Republic employees. Vignola offered to complete the projects without pay if necessary. He also asked the Republic customers to keep him and his new company in mind for any future business.

32. On Monday evening, Vignola met with Republic's president and offered to complete Republic's work in progress on a subcontract basis. His offer was declined. He did not inform the president of his offer to the customers to complete the work without pay if necessary.

33. Of the 20 employees who shifted to Vignola, 11 had at the time of the resignations been engaged in work in progress for several of Republic's clients. The remainder were apparently then unassigned.

34. During the week of December 8, at the suggestion of Vignola, employees of his who had been working on two of the accounts as Republic employees reported to those projects. Republic was to be paid for their services.

35. On December 12, 1969, the temporary restraining order, described above, was issued. Vignola's employees were then pulled off the Republic jobs to which they had reported.

36. On December 15, 1969, Vignola held a meeting with the 11 employees engaged in work in progress for Republic at the time of their resignations. He told them that because of the temporary restraining order they could not report to Republic's customers as employees of Computer Assistance of Hartford, Inc. He urged them to resign from Computer Assistance of Hartford and return to Republic so that Republic's contracts pending as of December 8 could be completed. He wrote a letter to each of the 11 to that effect and also a letter to Republic outlining the recommendations he had made to those employees.

37. As of the time of the hearing on December 19, 1969, nine of the eleven employees involved in pending contracts had resigned from Computer Assistance of Hartford and returned to Republic's employ for the purpose of completing work in progress.

38. Vignola and/or other members of his group or employees of defendant Computer Assistance, Inc. also contacted, in the early part of the week of December 8, some or all of Republic's prospective customers—that is, those to whom Republic had submitted proposals or who had furnished Republic with specifications by way of invitation of a proposal. These prospects were told of the resignations and the formation of a new corporation. Additionally, those contacted were apparently told that Computer Assistance of Hartford, Inc. would be available to bid on the proposed projects and on any future work.

39. Republic maintained a list of its present and prospective customers. Some of those customers, but not all, were listed as "representative clients" on various advertising brochures.

40. Certain kinds of information about a customer or prospective customer are of particular usefulness to those in the computer software business. Among them are: (a) the name of the person authorized to award contracts for work in this field; (b) the type and timing of any new jobs which might be coming up in the future; (c) the particular area of the client's business in which data processing services were or might be needed; (d) information relative to the amount budgeted by the client for this type of work over a given period of time; and (e) information about the client's own business as that relates to assisting in devising data processing solutions to its problems. Vignola and Republic's other former employees possessed, among them, as much of this kind of information as Republic had with respect to its former, present and prospective customers.

## CONCLUSIONS OF LAW AND DISCUSSION

1. Diversity jurisdiction exists in the federal court. 28 U.S.C. § 1332(a).

### Solicitation of Employees

2. Plaintiff is not entitled to damages for or an injunction against defendants' solicitation of its employees to resign from plaintiff's employ, enter defendants', and refuse to revoke their resignations to return to plaintiff. Such solicitation or inducement was not unlawful in the circumstances of this case.

 Since none of Republic's officers or employees served pursuant to an employment contract, each was employed for an indefinite term and entitled to terminate the employment relationship

at will at any time with or without cause. Somers v. Cooley Chevrolet Co., 146 Conn. 627, 629, 153 A.2d 426, 428 (1959); Boucher v. Godfrey, 119 Conn. 622, 627, 178 A. 655, 658 (1935).[1] Defendants Vignola and Geddes exercised that option on Friday, December 5, 1969, by depositing letters of resignation in the mail to the home office in New Jersey. At that point, they had committed themselves to no longer being employees and were no longer entitled to the benefits of the employment relationship. Similarly, obligations imposed by that relationship terminated at the time the letters were mailed.

Plaintiff urges the court to hold that the fiduciary obligation of these employees to plaintiff persisted until December 8, the date defendants calculated as that on which plaintiff would receive the letters, or at least until December 7, when plaintiff received actual notice of the resignations. However, I do not find that approach consistent with the recognized right in situations like the present of either party to terminate the employment relationship at any time with or without cause. There was no legal obligation to give advance notice of an intention to quit the job.

The evidence indicates that defendants were aware that solicitation of other employees might be inconsistent with the fiduciary obligation they had while they remained as employees, see, e. g., C-E-I-R, Inc. v. Computer Dynamics Corp., 229 Md. 357, 183 A.2d 374 (1962), and were careful to terminate their employment before embarking on any such solicitation. It is also apparent that defendants were using the normal delay of the mails, perhaps with the advice of counsel, to give themselves more time in which to maneuver before being challenged by plaintiff's president. Despite the lack of forthrightness thus evidenced, however, the facts of this case do not justify choosing a different time as the point of resignation. *Compare* Evarts v. Killingworth Mfg. Co., 20 Conn. 447 (1850). One of the risks of operating without employment contracts is that the employee (or employer) will exercise his right to terminate at any time and the crippling weakness of the plaintiff's case lies in the fact that unlike the employer in Sperry Rand Corp. v. Rothlein, 241 F.Supp. at 554, 559, *supra*, it did not have such contracts with its key employees.

Plaintiff urges the court to consider the meetings in March and April of 1969 at Vignola's home, Vignola's aborted resignation in May 1969 and the events of November and December 1969 leading up to the alliance with Computer Assistance, Inc. as a continuous scheme to solicit and induce Republic's employees to resign. This may be a tenable position, but I do not share it. A better view of the evidence is that the March and April meetings, though perhaps related to each other, were unrelated to the difficulty in May and that neither of these incidents was related to the events of November and December, except insofar as each reflects the frailty of employee tenure in this business.

Considering then the defendants' conduct in November and December separately, it is clear that none of the defendants solicited or induced any of plaintiff's employees to resign and join their organization until after their resignations had been mailed on December 5, 1969. Consequently, the applicable legal principles are those relating to the solicitation of employees not under contract by those without fiduciary obligations to the employer. The general rule and the economic and social considerations upon which it rests were expressed by Judge Learned Hand in 1929 as follows:

"So far as we have found, it has never been thought actionable to take away another's employee, when the defend-

---

1. The law of Connecticut applies to issues in this case. Franke v. Wiltschek, 209 F.2d 493, 494 (2d Cir. 1953); Sperry Rand Corp. v. Rothlein, 241 F.Supp. 549, 559 (D.Conn.1964).

ant wants to use him in his own business, however much the plaintiff may suffer. It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor. If an employer expects so much, he must secure it by contract." Harley & Lund Corp. v. Murray Rubber Co., 31 F.2d 932, 934 (2d Cir.), cert. denied, 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929).

*See also*, Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981 (2d Cir. 1918). Although no Connecticut cases have been found on this point, it appears that Judge Hand's perceptive analysis is still the prevailing rule absent an unlawful or improper purpose or means in the inducement. See Annot. 24 A.L.R.3d 822 (1969). In view of the widespread tendency toward job switching in these times, especially prevalent in the data processing services field, the evidence does not indicate the use of any such unlawful or improper purposes or means. *Compare* Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Falstaff Brewing Corp. v. Iowa Fruit & Prod. Co., 112 F. 2d 101 (8th Cir. 1940); Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir.), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932); Bausch & Lomb Optical Co. v. Wahlgren, 1 F.Supp. 799 (N.D.Ill.1932), aff'd, 68 F.2d 660 (7th Cir.), cert. denied, 292 U.S. 639, 54 S.Ct. 774, 78 L.Ed. 1491 (1934).

### Solicitation of Customers and Use of Trade Secrets

3. Plaintiff is not entitled to damages for or an injunction against defendants' solicitation of its present and prospective customers as that solicitation is not unlawful in the circumstances of this case.

■ The only evidence is that defendants did not solicit plaintiff's present or prospective customers until at least December 8, when they were no longer em-

ployees of, or subject to a fiduciary obligation to Republic Systems.[2] Under those circumstances, the rule is that, absent a restrictive covenant (as here), former employees may immediately and freely compete with their former employers, including solicitation of customers. Town & Country House & Homes Serv., Inc. v. Evans, 150 Conn. 314, 317, 189 A.2d 390, 393 (1963).

■ An exception to this rule is that a former employee cannot "use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." Allen Mfg. Co. v. Loika, 145 Conn. 509, 514, 144 A. 2d 306, 309 (1958). *See also*, Town & Country, *supra* 150 Conn. at 319, 189 A.2d 390; Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 125, 222 A.2d 220, 224 (1966). Plaintiff attempts to bring this case within that exception by arguing that its customer lists and other kinds of information (see finding of fact #40) about the customers are confidential. There is authority for the proposition that "[i]f in any particular business the list of customers is, because of some peculiarity of the business, in reality a trade secret and an employee has gained knowledge thereof as a matter of confidence, he will be restrained from using that knowledge against his employer." Town & Country, *supra* 150 Conn. at 320, 189 A.2d at 394.

■■ In order to merit the protection afforded for trade secrets, a customer list must consist of customers whose "trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money * * *." *Id.* at 319, 189 A.2d at 393. Moreover, "a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means." *Id. See also*, Allen Mfg. Co. v. Loika, *supra* 145 Conn. at 516, 144 A.2d 306. Criteria to con-

---

2. No customer was brought in to testify to the contrary.

sider in determining whether given information is a trade secret are:

"(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Restatement, 4 Torts § 757, comment b." Town and Country, *supra* 150 Conn. at 319, 189 A.2d at 393.

■ The plaintiff's customer lists do not qualify as trade secrets. Many of the clients were openly listed in plaintiff's advertising brochures as "representative clients." Others were those seeking bids from not only the plaintiff but also from the plaintiff's competitors. Furthermore, efforts to keep the names of the remainder secret were meager at best. In the computer software business, anyone with a computer is considered a potential customer and is actively sought after by firms like those involved here. Even plaintiff's president admitted on the stand that the names of his customers were not the most confidential aspect of his business. There was no indication that the plaintiff expended an unusual amount of effort, time or money in cultivating the trade and patronage of any of its clients or that others would have had great difficulty in acquiring the same information by permissible means.

■ The same considerations obtain with respect to the other kinds of information about plaintiff's customers (e. g. the name of the person who is authorized to let contracts in data processing services, new jobs coming up, the amount budgeted for these kinds of services, etc.) which plaintiff claims to be confidential. I find that all of the claimed

information lacks confidentiality. The evidence indicated that it would be comparatively easy for others to properly obtain it and that plaintiff took scant precautions in guarding its secrecy. *Cf.* Boosing v. Dorman, 148 App.Div. 824, 133 N.Y.S. 910, 912, aff'd, 210 N.Y. 529, 103 N.E. 1121 (1912); *Compare* Triangle Sheet Metal Works, Inc. v. Silver, *supra.*

### Tortious Interference

The plaintiff also contends that, even in the absence of the use of confidential information, defendants' conduct in this case was tortious. They rely on R an W Hat Shop, Inc. v. Sculley, 98 Conn. 1, at 14, 118 A. 55, at 59 (1922), wherein the court held:

"The intentional procurement of the breach of an existent contract, if done with knowledge of the contract and without just cause or excuse, makes him who causes the breach liable for the resulting damage, and this is so even though he acted in promoting his own legitimate interests."

But it is clear from what happened here that the motives and methods of the defendants do not fit the thesis that the defendants intentionally sought to procure the breach of any of Republic's contracts with its customers or that any such breach occurred.

■ Defendants, having resigned, had, absent considerations of confidential information, as much freedom to compete as any other competitor in the field. While that freedom is not absolute, certainly it encompasses informing plaintiff's customers of their resignations from plaintiff's employment and of the formation of a new company, and that the new company would be available for future work. Moreover, it being apparent that plaintiff could not complete the pending contracts without at least hiring a new staff, it was not improper to inform the customer that the former employees would complete the work and that the customer could pay Republic for the services thus performed—that was certainly not a tor-

tious interference with plaintiff's contractual relations with its customers. *Cf*. 1 Harper and James, Law of Torts 518 (1956); Restatement of Torts § 768.

## CONCLUSION

Since the defendants' solicitation of plaintiff's employees and customers was not unlawful and there has been no tortious interference with plaintiff's business or contractual relations, plaintiff's application for a permanent injunction is denied. The temporary restraining order now in effect is hereby dissolved. No damages are awarded for what has already occurred.

So ordered.