## CIRCUIT COURT OF WARREN COUNTY

Shenandoah Studios
of Stained Glass, Inc.

v.

Waters

May 10, 1983

Case No. (Chancery) 4390

BY JUDGE HENRY H. WHITING

The Court has carefully reviewed its trial notes, the very helpful memoranda submitted by counsel, all of the documentary evidence, the discovery depositions taken January 24, 1983, the transcript of the evidence heard on the preliminary injunction hearing on December 3, 1982, and has arrived at its opinion in this case.

*Facts*

The complainant is a large and successful retailer of church windows engaged in their installation, repair and renovation, together with a protective storm window installed on the outside of such church windows. Organized principally by Mr. Dennison and Mrs. Monahan when they left a much larger company engaged in a similar business, it has been in business in the eastern United States for the past three and a half years. Mr. Dennison had been with that larger company twenty-eight years, the last nine years in Front Royal. Neither Mr. Dennison nor Mrs. Monahan had a non-competition agreement with their former employer, and they engaged in business in the same area as their former employer.

The defendant, Waters, who had also previously worked for the same larger company, was employed by the complainant in July of 1981 as a salesman and also to do certain advertising work. He was

paid a salary of about $1,000.00 a month, plus a commission which formed most of his remuneration.

In the last three months of his employment, he decided to leave the company and did finally give notice in the fall of 1982. Prior to the time he left the company, the defendant not only discussed his plans to form a competing business with some of the other employees and solicited them to join him but also discussed his plans with a limited number of customers he was then soliciting for Shenandoah Studios, advising them that he could get them a lower price because of a reduced overhead after he went into business. Shortly after Mr. Waters left Shenandoah Studios, he kept an appointment with a Lexington church which he had made while still employed by Shenandoah Studios and showed certain slides extolling the virtues of the work which could be performed by a stained glass window company, using the slide projector owned by Shenandoah Studios and at least some of the slides developed by him while employed by Shenandoah Studios in an effort to get that church to contract with his new company. He also signed a contract for his own company to do work for the Henderson United Methodist Church, although he had already solicited that church while a salesman for complainant and never told the church officials that it was contracting with a competing firm, rather than his former employer. The Court recognizes the defendant's denial of this and the contract with a differently named corporation than Shenandoah Studios but believes the weight of the evidence establishes Mr. Thrift's recollection as the correct version of what happened. However, even if Mr. Waters was correct in his version of the Henderson Church transaction, he does admit he did not tell Shenandoah Studios that he was making a bid or give it an opportunity to submit another bid and to follow up with a call he had made when employed by Shenandoah Studios, even though he had gotten the lead card from his employer and this was not one of his "cold calls."

There were undoubtedly other instances of conduct this Court regards as overreaching and perhaps unethical, but the foregoing seems to be the most egregious examples of misconduct on the part of the defendant.

Given that conduct, the Court must examine the evidence to see whether a sufficient basis has been established to permit an injunction. The Court did grant a temporary injunction because most of this

evidence was developed at the preliminary hearing, and it did seem that the employee was "playing it fast and loose."

The complainant contends that it is entitled to protection against competition with those customers the defendant solicited and gave prices to as a trade secret. Both counsel have referred the Court to the extensive 278-page annotation at 28 A.L.R. 3d, page 7. This annotation presents a bewildering array of cases in which as many circumstances are presented as the ingenuity of competing employees can devise in leaving their former employers. No Virginia cases are noted. The summary and comment point to the conflicting philosophies which must be reconciled in this kind of case; public interest in free competition and individual freedom on the one hand against an employer's right to the protection of his business assets and a general interest in maintaining certain standards of commercial morality. 28 A.L.R. 3d, p. 18. The annotation recognizes the general right of the former employee to freely compete for his former employer's customers absent a restrictive covenant but a duty not to use trade secrets or other confidential information acquired in the course of his previous employment, and the annotation was concerned with just what confidential information is entitled to protection as "trade secrets."

There is no written or verbal agreement not to compete. Many of the cases cited in the extensive annotation at 28 A.L.R. 3d 7 were grounded on such an agreement, but there is none in this case. Courts should be careful not to create a contract by unjustifiably treating information as trade secrets. *E. W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108 (8th Cir. 1969). As that Court said:

> This protection given to trade secrets is a shield, sanctioned by the courts, for the preservation of trust in confidential relationships; it is not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience should they decide to resign. This shield is not a substitute for an agreement by the employee not to compete with his employer after the termination of employment. *Id.*, at 1112–1113.

If relief is to be granted, it must be on the basis of a violation of some duty the former employee owed his employer which survived the termination of the employment. Counsel have cited no Virginia

cases addressing this issue, and the Court must look to the law in other jurisdictions to see whether there is any injunctive remedy against such conduct, which has not been forthright.

After a careful review of all of the evidence and the authorities cited, the Court is of the opinion that the complainant is not entitled to a permanent injunction, and it bases its ruling upon the following considerations.

(1) While some cases have awarded injunctive relief where an employee has breached his duty of loyalty *prior* to leaving the employer, *People's Coat, Apron & Towel Supply Co. v. Light*, 171 App. Div. 671, 157 N.Y. Supp., N.Y.S. 15, aff'd. 224 N.Y. 727, 121 N.E. 884 (1916) (former employee of a linen route continued to call on his employer's customers, deceiving them into believing he was still employed and serving them on behalf of the employer, the customers being known only to the employee because of the regular route he had been assigned by the employer); *Inland Rubber Corp. v. Triple A's Tire Service*, 210 F. Supp. 880 (D.C. N.Y. 1962) (removal of records containing customer information and filling orders taken on the employer's behalf but merchandise furnished by the competing company), most of the cases cited and discussed in the annotation have denied relief where the misconduct involved isolated transactions and failed to show a pervasive attempt to preempt the customers prior to leaving the employer. The Court does not believe such an attempt has been shown in this case.

(2) There has been no showing of a theft of a customer list. In *Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.*, 160 S.E.2d 356 (Ga. 1968), there was a restrictive covenant against competition which was held in general restraint of trade and therefore unenforceable. The employee had been a sales manager and had met many of the customers, gained their confidence, and learned of their product requirements, as well as the confidential pricing policies and product characteristics of his employer. When he left his employer and began working in a similar capacity with a competitor, an injunction was sought against them and granted by the lower court. This injunction decree was reversed on appeal because the particular information the employee had used was information general to the industry, coupled with a general knowledge of the plaintiff's business, the Court pointing out further that the knowledge of names and addresses of the customers was not a trade secret of the employer

and those customers could be solicited in the absence of a theft of a list, not shown in that case or in the instant case.

(3) The information taken and the contracts worked fail to show unfair competition or the use of a trade secret. In *Republic Systems & Programming, Inc. v. Computer Assistance, Inc.*, 322 F. Supp. 619, 626 (D. Conn. 1970), several executives left a computer software company and formed a competing company, soliciting the former customers and *taking the customer list*. The findings of fact contained a number of instances of conduct very similar to that engaged in by the defendant in this case, but after a review of all that conduct and a reference to the annotation at 24 A.L.R. 3d 822, the court held that the acquisition of specific information about customers and prospective customers, which included: (1) the name of the person authorized to award software contracts; (2) the type and timing of any new jobs coming up in the future; (3) the particular area of the customer business in which data processing services were or might be needed; (4) budget information of the client; (5) information about the business which relates to assist in devising data processing solutions, did not qualify as a trade secret since there must be a substantial element of secrecy difficult to acquire except by improper means. The Court indicated that some of these customers were listed on various advertising brochures as representative clients, and that was the situation in this case as well.

The Court in *Republic Systems* also indicated that the customer list must have been secured by years of business effort, advertising, and the expenditure of time and money, but there was no indication of any unusual amount of time, effort, or money to cultivate the patronage or that anyone else would have great difficulty in acquiring the same information by permissible means. *Id.* at 628. Shenandoah Studios' customer names seem to rise no higher than *Republic's*. The amounts expended to acquire those names was minimal, consisting of some mailing solicitations and purchase of directories. The names never were summarized in a list. They were simply kept in files as "active prospects" with whom contact had been established by salesmen. No list was needed; this defendant could easily retain those names in his memory, and the courts usually do not request former employees to "forget" what they learned in their jobs. The amount expended to acquire those names hardly reaches the expenditures shown in acquiring the customer list as in *Erik Electric Co. v.*

*Elliott*, 375 So. 2d 1136 (Fla. App. 1979). There $58,000.00 was spent to secure a screened customer list. In that case, the salesman was enjoined from competition where he *took the extensive confidential lists* and leads supplied to him from inquiry cards and attempted to compete. The *Erik Electric* case pointed out its distinction from the ordinary customer listing case, where listings were readily available to the public, "inasmuch as we are not dealing with the listings *per se* but rather with a distillation of larger lists, reflecting considerable effort, knowledge, time, and expertise on the part of the plaintiff." *Id.* at 1138.

Complainant has a further difficulty in that the customer lists were not sufficiently secret. Here the evidence shows that it publicized a number of these churches' names now said to be confidential in brochures as their customers. *Cf., Cherne Indus., Inc. v. Grounds & Associates*, 278 N.W.2d 81, 91 (1971) (where clients' names were never published or revealed).

If the list is to be protected, it must, in fact, be secret with sufficient measures taken to safeguard the lists and information contained therein. *Republic Systems, supra; Hickory Specialties, Inc. v. B & L Laboratories, Inc.*, 592 S.W.2d 583 (Tenn. App. 1979) (secret smoking process arrived at through years of trial and error experimentation protected against an employee who agreed not to divulge it but did so after leaving; there was no agreement not to divulge it, but all employees who acquired the information were warned not to divulge it to outsiders, and the plant and process were excluded from free public access.) The court indicated that in order that it be a trade secret, "absolute secrecy is not required [but] there must be a substantial element of secrecy so that a third person would have difficulty in acquiring the necessary information or manufacturing the product without resorting to the use of improper means of acquiring the secret." *Id.* at 587. In this case, a large part of the customer list could easily be obtained by reading the brochure issued by the complainant. While the bid price might be unique, it is not shown to have been vital in the customer relationship, rather the quality of the service is apparently the criteria, and lowering the price slightly under the bid is not shown to have been the decisive factor in the award of the contract and of such moment as the smoking process obviously was in *Hickory Specialties, Inc.*

In summary, the Court, while feeling that Mr. Waters has not been "entirely forthright" in dealing with his former employer during his

term of employment and immediately subsequent thereto, cannot find that he used any trade secrets, written lists of names, or other similar confidential matters given to him or acquired by him in violation of duty but has merely used general information concerning the names of customers retained in his memory and not acquired in breach of duty. Rest., Agency 2d § 396(b).

The Court further notes that even if an injunction should be awarded, it does not believe the period should extend beyond six months. While the evidence is conflicting as to how long a "prospect" is a potential customer and the period would not necessarily be the forty-five day period to accept the offer, as contended by Mr. Waters, the evidence fails to show any reasonable expectation of protection beyond a six-months' period, which the court finds to be a reasonable one if the injunction should be awarded.

### Damages

The Court feels that both the Leake's Chapel Church and the Henderson Church jobs were acquired in breach of his duty of fair dealing while acting as agent but cannot make an award of damages. The complainant could have recovered what profit *it* might have made on those jobs if it had done them but introduced no evidence from which the Court could make any estimate of the amount thereof. Instead, it chose to attempt to recover the profit the defendant actually made on the job. Unfortunately, it only showed the gross profit and introduced no evidence to establish the proper overhead and a subsequent net profit. The defendant's evidence may have included some items which should have been capitalized and only a portion charged to the job, but there was insufficient evidence from which any such calculation could be made and, therefore, nothing to contradict the contention that there was actually a loss to the complainant on these two jobs.

### Evidence Question

The admission of evidence of what the various church officials told Mr. Waters about the amount of the competitor's bids was strongly attacked as hearsay. The complainant contends it was not being introduced to show the *amounts* of the bids but only to disclose that the bids were not kept secret. The defendant says this testimony is hearsay because it asserts a fact, that third parties disclosed the bid

amounts, and they must be subjected to cross-examination. The point is not free from doubt, but the Court believes the evidence is being introduced only to show that such a statement was made or information divulged and not to prove the truth of the assertion and, therefore, not hearsay. However, the point is moot because the Court did not consider the fact that the bids were not always kept confidential as necessary in its holding. It believes that, even if confidential, those bids:

(a) Were not used by the defendant.

(b) If used, were not a significant element in the award of any contract, both parties agreeing the quality of work and personal contact were the primary considerations.

(c) If a significant element in the award, could not be useful after a period of six months from the time the bid was made.

## *Conclusion*

The temporary injunction should be dissolved, the prayer for a permanent injunction and damages denied, and the case dismissed at the cost of the complainant.