R AN W HAT SHOP, INC. *vs.* JEREMIAH SCULLEY ET ALS.

Third Judicial District, Bridgeport, April Term, 1922.
WHEELER, C. J., BEACH, GAGER, CURTIS and BURFEE, Js.

Everyone has the legal right to enter into any contract which does not wrongfully infringe upon the legal rights of others or contravene the right of the public; and each party to a contract acquires the right to have it fulfilled according to its terms or to recover damages for its breach.

Each party to a contract has a property right in it, infringement of which by a third person, if done intentionally by one not having equal or superior rights, or by one knowing of this relation, subjects him to an action for the damage resulting from the tort in favor of the party to the contract who has suffered damage from its breach.

One who interferes with this relation, acting under a right of his own and in ignorance of the contract relation, or acting under an equal or superior right, commits no tort.

The procuring of the breach of an existing contract by one for a commendable purpose, as to procure for his fellow employees steady employment, cannot be justified as an exercise of an equal or superior right, since such a justification cannot rest upon the violation of existing rights of contract.

In the present case the plaintiff, who was a "finisher" of hats "made in the rough" by others, had placed a number of orders for "hats in the rough " with one M, which he had accepted but had not then filled. In this situation two of the defendants, Green and Lawlor, who were national officers of the United Hatters of North America, instructed the officers of the local unions in Danbury and Norwalk

(1)

in this State, that union "finishing" shops should be given preference over nonunion shops, until the needs of the union shops for hats made in the rough were satisfied, and these instructions were imparted by the local officers, defendants Sculley and O'Hara, to M, who ran a union shop for making "hats in the rough." Sculley and O'Hara knew at the time they gave the instructions, that M had existing contracts which would be breached if the instructions were carried out by M. No threats were used, but M obeyed the instructions and broke his contract with the plaintiff because of his knowledge of the power of the unions to embarrass him in his business, and because he feared they would do so and exact a penalty from him in case of his noncompliance. The local unions as a body took no action on these instructions. As a result of M's breach of his contract, the plaintiff, who ran a nonunion or open shop, suffered a loss of over $5,000. *Held:*—

1. That Green and Lawlor had knowledge of plaintiff's contracts with M, through the knowledge of their agents Sculley and O'Hara, and that in procuring M to break these contracts, all four of these defendants committed a wrongful act, intentionally done, and hence were liable for the resulting damage.

2. That the fact that they acted for the purpose of benefiting the members of their union by securing for them the means for steady employment, however commendable their purpose, could not justify them in procuring M to breach his contracts with plaintiff.

Required corrections of the finding are unnecessary if they are fairly involved in the finding as made.

What the purpose of the defendants was, in the course taken by them, is a matter of inference from the evidence, to be drawn by the trial court.

The failure of a party to keep his promise to produce a letter called for upon the trial, may give rise to an inference prejudicial to him, but that is an evidential matter for the trier to determine.

Evidence has no place in a finding.

The plaintiff insisted that the defendants used threats and coercion to induce M to break his contract with the plaintiff. *Held* that upon the evidence the refusal of the trial court to so find was not unreasonable.

Through inadvertence the trial court failed to make a finding as to the damage sustained by the plaintiff. *Held* that inasmuch as there was no serious conflict as to this, the finding should be corrected accordingly.

The plaintiff contended that the defendants had unlawfully combined to boycott and injure it. *Held* that upon the facts as found this claim could not be made.

Claims not made upon the trial nor in the appeal, cannot be urged in this court.

Argued April 13th—decided August 4th, 1922.

SUIT to restrain the defendants from combining and conspiring together to injure the plaintiff's business, and for damages, brought to and tried by the Superior Court in Fairfield County, *Maltbie, J.;* facts found and judgment rendered for the defendants, and appeal by the plaintiff. *Error and judgment reversed.*

The process of the manufacture of fur felt hats is divided into two parts: one, the production of the "hats in the rough," called the "making," the other, the completion of the "hats in the rough" ready for wear, called the "finishing." Many factories carry on both branches of the manufacture, while some confine their business to the "making," and some to the "finishing." The workers employed in these processes are known as "makers," and "finishers," and, in addition, certain women who work in the finishing shops are known as "trimmers"; each of these classes follows what is practically a different craft. The business is largely unionized, and the local unions are made up of those who follow one of these craft. These craft are bound together by joint interests, and together make up one trade, and all the unions are affiliated as the "United Hatters of North America," a voluntary association, with some ten thousand members and about thirty unions.

The defendant Local No. 10 is a union of "makers" employed in Danbury and vicinity, of which defendant Jeremiah Sculley is president and defendant John O'Hara is secretary. The defendant Local No. 11 is a union of "finishers" employed in Danbury and vicinity, of which defendant Cornelius McCue is president and Hugh Shalvoy is secretary. The defendant Local No. 15 is a union of "makers" employed in Norwalk and vicinity. The defendant Local No. 16 is a union of "finishers" employed in Norwalk and vicinity, of which Charles Lynch is president and the defendant

Royal Raymond is secretary. Each of these unions is a voluntary association.

The defendant Michael Green is the national president of the United Hatters of North America, and the defendant Martin Lawlor is the national secretary and treasurer of that organization.

Prior to June, 1919, union manufacturers of "hats in the rough" were not restricted by any rule or custom from selling that product to any finisher whether or not he conducted a union shop, and neither rule nor custom of the unions gave union "finishing" shops any preference. Union workmen in "finishing" shops, however, would not, and by the custom of the unions were forbidden to, work on "hats in the rough" which were produced in nonunion "making" shops.

The hatters' unions own and control a label or distinctive mark, known as a "union label," which under certain conditions they permit union manufacturers to attach to hats finished in their shops, and which is supposed to make the product so marked more salable and marketable than hats not bearing that label. No manufacturer is, however, permitted to use that label unless all work done upon the hats, in his own or any other shop, is carried on under union rules.

The plaintiff is a New York corporation, having succeeded to the business, trade-mark, and good-will of a concern known as Rosenwald-Wimpfheimer, and being engaged in the business of finishing hats made from fur felt "hats in the rough," and in selling the same, and operates a factory in Norwalk for the conduct of its business. Rosenwald-Wimpfheimer had operated as a union finishing shop under an agreement with Local No. 16 until about April, 1918, and they at this time became an "open" or nonunion shop, and ever since this time they and the plaintiff have continued to be such, purchasing "hats in the rough"

required in their business in the open market in and outside of Connecticut.

There is a considerable demand for fur felt hats in the spring, but a much greater demand in the fall. Orders for the fall trade are received by "finishing" shops in the spring, and delivery is usually required before October 1st following. "Finishing" shops which do not produce their own "hats in the rough," order this product from "making" shops in the spring and summer, in time to make up the hats they have sold for delivery not later than this date.

In the spring of 1919, both union and nonunion shops had difficulty in purchasing sufficient "hats in the rough" to fill their orders. Because of this lack of material, union "finishing" shops were either unable to, or were threatened with inability to, operate full time. Complaints of this were made to the officers of the United Hatters of North America, and these came to the attention of the defendants Green and Lawlor, as president and secretary and treasurer, respectively, of that organization. In the effort to secure an adequate supply of "hats in the rough" for the union "finishing" shops, defendants Green and Lawlor instructed orally and in writing the officers of local unions, including those in Danbury, to visit and inform the union "making" shops that in their judgment union "finishing" shops should be given preference over nonunion "finishing" shops in the matter of supplying "hats in the rough," and that no shipments of these should be made to the latter until the needs of the union "finishing" shops had been satisfied. These instructions came in due course to the officers of Locals Nos. 10 and 11 at Danbury, but these unions never as a body took action thereon.

Defendants Sculley and O'Hara, president and secretary of Local No. 10, singly or together, either in

person or by other means of communication, gave
these instructions to the officers of six or seven of the
union "making " shops in Danbury, and these officers
stated to these shops the purport of the instructions they
had received. The instructions of Green and Lawlor
were not confined to this State and were not directed
against any particular manufacturer. Their immediate
purpose was to secure sufficient "hats in the rough"
for union "finishing" shops, and thereby to secure
steady employment for the members of the affiliated
unions. The natural effect of these instructions, if
carried out, would be to make it more difficult, if not
in some instances impossible, for nonunion "finishing"
shops to secure sufficient "hats in the rough" with
which they could fill their orders and keep their shops
open, and to cause breaches of contract between union
"making" shops and nonunion "finishing" shops;
and all this defendants Green, Lawlor, Sculley and
O'Hara knew, or ought as reasonable men to have
known. The giving of these instructions was a reason-
able means to the end purposed and they were adopted
in good faith.

On June 24th, 1919, plaintiff had orders for 6,200
dozen hats for fall delivery, their value being between
$300,000 and $400,000, and about ninety per cent
thereof were from customers outside the State and
called for delivery outside the State. It had con-
tracted for substantially enough "hats in the rough"
to take care of its needs in filling its own orders; its con-
tracts being about equally divided between union and
nonunion shops. The plaintiff and its predecessor
had for a number of years purchased a considerable
number of "hats in the rough" from George McLach-
lan, who operated a union "making" shop in Danbury.
Prior to June 24th, 1919, plaintiff had ordered from
McLachlan a very considerable number of these hats,

which he had accepted for fall delivery, but delivery for a large part of these orders had not at this time been made. On said day Sculley and O'Hara, pursuant to the instructions received from Green and Lawlor, visited McLachlan and stated to him the purport of the instructions.

At this interview it appeared that McLachlan had a lot of "hats in the rough" ready for shipment to plaintiff. McLachlan inquired if he should deliver these, and Sculley and O'Hara asked if he had any others ready for shipment for plaintiff in the shop, and ascertaining that there were none, told McLachlan that he might deliver the hats ready for shipment. They did not ask him whether he had accepted orders from the plaintiff which were not filled, nor were they informed, nor did they have knowledge as to this, but from the purport of the conversation and McLachlan's conduct they might, as reasonable men, have so inferred.

A few days later McLachlan asked and received permission to deliver to plaintiff a few dozen more of hats which were of a special kind. McLachlan delivered to plaintiff no other hats than these after this time upon its orders.

Sculley and O'Hara used no threats to McLachlan, but he obeyed the instructions and breached his contract with plaintiff because of his knowledge of the power of the unions to embarrass him in the operation of his factory, and his fear that they would do so and exact a penalty from him. McLachlan would, without these instructions, have filled these orders, but he was not sorry to have a reason for breaching his contract with plaintiff, because he could obtain for the undelivered hats a price higher than the contract price. A few days after McLachlan ceased shipments to plaintiff, Wimpfheimer, president and treasurer of plaintiff, se-

cured an interview with Sculley and O'Hara, and asked that McLachlan be permitted to continue filling plaintiff's orders, but they refused to grant this. In the course of the interview, Sculley and O'Hara either learned that McLachlan had in his shop accepted and unfilled orders from the plaintiff, or heard statements which would have indicated to any reasonable person that this was the case. A few days after this action was begun, plaintiff sought to have McLachlan resume shipments to it, and thereupon McLachlan asked O'Hara for such permission, but he refused to give it. By reason of McLachlan's breach of his contract plaintiff suffered a very considerable loss.

The court reached the following conclusions: (1) The purpose of the defendants Green and Lawlor in giving these instructions, and of defendants Sculley, O'Hara and McCue in carrying them out as they did, was legitimate. (2) The giving and carrying out of these instructions was a reasonable means to accomplish that purpose. (3) Any incidental interference with the contract rights of the plaintiff arising out of the acceptance of its orders by McLachlan was therefore justifiable. (4) The defendants are not then liable to the plaintiff for any damage it may have suffered by reason of that interference.

*Walter Gordon Merritt* of New York City, and *Thomas Hewes,* for the appellant (plaintiff).

*Arthur B. O'Keefe,* with whom, on the brief, was *David E. Fitzgerald,* for the appellees (defendants).

WHEELER, C. J. We shall take up first the corrections of the finding which appellant seeks to have made. There are ninety-seven of these, of which only a few are specifically pursued in the brief. Their disposal did not require the printing of the entire evidence. It

was an abuse of our practice to have caused this evidence to have been made a part of the record. Counsel for the appellant use this evidence not only in relation to the errors as to the finding, but also in support of their grounds of argument. This latter use is wholly contrary to our practice and is essentially unfair. No litigant was ever benefited in this court by the improper use of evidence made a part of the record for the limited purpose of correcting the finding. The trial court finds that it was not the purpose of Green and Lawlor in the instructions given, nor of Sculley or O'Hara, to cause the breach of any existing contracts. But the court also finds that the natural effect of the instructions, if carried out, would be to cause breaches of contracts, and that these defendants ought as reasonable men to have known this.

Sculley and O'Hara knew that McLachlan was doing business with the plaintiff. They failed to ask McLachlan whether the plaintiff had any contracts for unfilled orders with him. The court found that they might well have inferred from their conversation with, and from the conduct of, McLachlan that he had then no other accepted and unfilled orders from the plaintiff. This does not seem to us to have been a reasonable inference to draw, but rather that the circumstances were such as to put them on inquiry as to whether McLachlan had unfilled orders from plaintiff at this time, June 24th, and that the substance of draft-finding 45 should have been found. But whether these defendants should have been charged with this knowledge at this time becomes unimportant in view of the finding that a few days later they learned that McLachlan had accepted, unfilled orders from plaintiff, or heard statements which would have indicated this to any reasonable person. Having acquired such notice, if they persisted in procuring the continuance of the breach

of plaintiff's contract, their responsibility will arise in the same way as it would if they had had notice when they first procured the breach. Bigelow on Torts (8th Ed.) p. 259.

The plaintiff's draft-finding 47, that "defendants Sculley and O'Hara, with knowledge of the existence of the orders placed by the plaintiff with McLachlan, induced and persuaded him to break his contracts with plaintiff," might well have been specifically found, but as we read the finding it is fairly involved in it, so that there is no occasion to add this request.

The court refused to find plaintiff's request 8, that defendants' purpose was to make plaintiff's factory a union shop, and to accomplish that by means of injury inflicted upon it. These claims were matters of inference from the evidence and for the court to draw. The instructions as to giving union finishing shops the preference was given by letter to the officers of the local unions, including Sculley and O'Hara, by the officers of the national organization, Green and Lawlor. Upon plaintiff's demand at the trial, defendants promised to produce the letter, but failed to do so. Plaintiff seeks to have inserted in the finding the inference which it claims should be drawn from this failure to produce. Evidence has no place in a finding. There is nothing in the record showing that the court did not consider this item of evidence in connection with the rest of the evidence.

We do not find that the court was in error in refusing to find that defendants employed threats and coercion to procure McLachlan to breach his contracts with plaintiff, nor in refusing to find that defendants conspired to prevent McLachlan from producing hat bodies for plaintiff. The court's refusal under the evidence was not unreasonable.

The court has inadvertently failed to make a finding as to the damage suffered by plaintiff through the

breach by McLachlan of his contracts. There appears to have been no serious conflict as to this. There should be added to the finding substantially paragraph 70 of the draft-finding, viz: as a result of the refusal of Mc-Lachlan to deliver the hat bodies contracted for by plaintiff, it was compelled to purchase them elsewhere at a cost over the contract prices of $5,139.75, and the damage suffered by plaintiff from such breach was $5,139.75.

The action of the trial court as to the other findings complained of is too plainly justified to require discussion. There remains to consider, upon the finding as thus corrected, the questions of law which appellant discusses in its brief. Point 2, that "the combination engaged in by defendants was an unlawful conspiracy in restraint of interstate trade and commerce," we shall refrain from discussing in view of the conclusion reached upon another ground of appeal. Point 3, that "the combination in which defendants are engaged is an unlawful combination to boycott and injure the plaintiff," does not arise upon the facts found. Point 4, that "the defendants employed threats and coercion for the purpose of intimidating McLachlan into breaching his contracts and such action by them was unlawful," is not raised by the finding. Moreover, if these facts did appear in the finding, the plaintiff could not urge the claim that defendants' conduct was forbidden by General Statutes, § 6358, since no such claim appears to have been made upon the trial and is not found in the appeal.

The single remaining question before us is stated in plaintiff's brief as follows: "It is unlawful to knowingly induce a breach of contract either with intent to injure a third party or to secure a benefit for oneself." The facts found show that defendants Sculley and O'Hara were the agents of Green and Lawlor throughout this

transaction. They further show that defendants Green, Lawlor, Sculley and O'Hara intentionally procured, by means of these instructions, the breach of McLachlan's contracts with plaintiff, when Sculley and O'Hara had personal knowledge of their existence and Green and Lawlor had knowledge through that of their agents Sculley and O'Hara, for the purpose of securing for union "finishing" shops an adequate supply of "hats in the rough," so as to secure to the members of the affiliated unions steady employment. It thus appears that these defendants, who represented these unions, knew of these contracts when they procured their breach, and that their purpose was to benefit the unions and their members.

The plaintiff was free· to make any legal contract with McLachlan, and he with the plaintiff, which did not wrongfully infringe upon the legal rights of others or offend against public rights, and their liberty to so contract was a right which our law gave and guaranteed to each. When the plaintiff and McLachlan entered into their contracts, each acquired the right to have the other fulfil them according to their terms, or to obtain damages for the failure to fulfil. These were the duties which the contracts imposed on each, and these were the rights which they created. Such contract relation gave to each a property right in the contracts, and any intentional interference with the rights of either by a third party was an interference with his rights of property, and if intentionally done by one not having equal or superior rights or by one knowing of this contract relation, it was a wrongful interference subjecting him who procured the breach to an action for the damage resulting from the tort.

When one acting under a right of his own interferes with an existing contract in ignorance of it, he has committed no wrong. The mere fact that his act in-

jures another does not create a liability, for he was acting within his own rights and did not intentionally or wrongfully cause the injuries. And where one acting under an equal or a superior right causes such injury to a contract relation, he will not be liable for resulting damage, for he had a right to do what he did. Procuring the breach of a contract without knowledge of it, or acting in the exercise of an equal or a superior right, is acting with just cause or excuse, and, when this appears, it is a justification for what would otherwise be an actionable wrong.

Sculley and O'Hara acted with personal knowledge of plaintiff's contracts. Green and Lawlor acted with knowledge, because their agents, Sculley and O'Hara, obtained this knowledge while carrying out the instructions of their principals, Green and Lawlor. Their attempted justification is that they acted in the exercise of an equal or superior right to that of the plaintiff, and that the injury to it was incidental to their exercise of their undoubted right, and consequently was *damnum absque injuria*. Their justification is that they sought to benefit those whom they represent by securing for them the means for steady employment. The purpose was legitimate and commendable, but it could not be carried out in disregard of the rights of plaintiff, which were existent before this purpose was conceived. The plaintiff's rights were superior to those of these defendants. A justification for injury to another cannot rest upon the violation of his existing rights which he who justifies knew of. Though the defendants' purpose was commendable, the means used to carry it through cannot be justified. The knowingly procuring McLachlan to breach his contracts with plaintiff were wrongful acts of defendants and done intentionally by them, and for the resulting damage they are liable. "The gist of the action is not the intent to injure, but to

interfere without justification with plaintiff's contractual rights with knowledge thereof." *Lamb* v. *Cheney & Son*, 227 N. Y. 418, 422, 125 N. E. 817; *Quinn* v. *Leathem*, L. R. (1901) App. Cas. 495.

The trial court held that liability for procuring the breach of these contracts would have arisen had their breach been the end sought, but when the end sought was the securing of work for the members of the union and the breach of the contracts was an incident following the carrying out of this legitimate purpose, no liability would arise. If such a doctrine were law, a third person or combination of persons could compel the breach of any contract and justify by saying to him who had suffered great loss because of the breach of his contract: "We did not do it to cause you injury or to breach your contract, but to improve our financial condition; the breach of your contract was a mere incident to the fulfillment of our purpose." The inviolability of contracts would then be an incident to the self-interest of men. It may be that an occasional authority has announced this doctrine, but an extended examination satisfies us that the authorities generally upon this subject are not in accord with it and are in accord with the conclusions to which we have come.

The intentional procurement of the breach of an existent contract, if done with knowledge of the contract and without just cause or excuse, makes him who causes the breach liable for resulting damage; and this is so even though he acted in promoting his own legitimate interests. This principle originated, so far as fixing it in definite and clear statement in a given case, in 1853, in *Lumley* v. *Gye*, 2 El. & Bl. 216, in an action on the case for a breach of a contract for personal service. That court announced the principle that the duty rested upon all, not parties to the contract but having knowl-

edge of it, not to maliciously procure the breach of the contract, and that such a violation of duty was wrongful and for it an action on the case would lie. *Bowen* v. *Hall*, L. R. 6 Q. B. D. 333, 337, in 1881, reaffirmed this principle as applicable to all kinds of contracts, and so the law of England has remained. "Maliciously" was used not in the sense of ill will, but that the act done was a wrongful and unlawful act. Lord Crompton, in *Lumley* v. *Gye*, says "that a person who wrongfully and maliciously, or, which is the same thing, with notice, interrupts the relation subsisting between master and servant . . . whereby the master is injured, commits a wrongful act." Lord James observes, in *South Wales Miners Federation* v. *Glamorgan Coal Co., Ltd.*, L. R. (1905) App. Cas. 239, 250: "If the breach of the contract of service by the workmen was an unlawful act, any one who induces and procures the workmen, without just cause or excuse, to break such contract also acts unlawfully, and thus the allegation that the act done was wrongfully done is established." Lord Lindley, in *Quinn* v. *Leathem*, L. R. (1901) App. Cas. 495, 535, states the principle in this way: "But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact—in other words, if he is wrongfully and intentionally struck at through others, and is thereby damnified—" he has an action. In *Bromage* v. *Prosser*, 4 Barn. & Cress. 247, 255, the court defines "maliciously." "In its legal sense it means a wrongful act, done intentionally, without just cause or excuse." See also *Mogul Steamship Co.* v. *McGregor*, L. R. 23 Q. B. D. 598, 613. These authorities hold that "maliciously" merely means wrongful or unlawful in the sense of an act done without justification.

The Supreme Judicial Court of Massachusetts in 1871, some ten years before *Bowen* v. *Hall*, announced,

in an action on the case for procuring the breach of a contract, this principle as applicable to all cases of breaches of contracts, and held that "if such a contract [for employment] exists, one who knowingly and intentionally procures it to be violated may be held liable for the wrong, although he did it for the purpose of promoting his own business." *Walker* v. *Cronin*, 107 Mass. 555, 563. In 1893, in *Angle* v. *Chicago, St. P., M. & O. Ry. Co.*, 151 U. S. 1, 13, 14 Sup. Ct. 240, the Supreme Court of the United States sustained a cause of action in which it was alleged that through the efforts of the defendant, the performance by the plaintiff of his contract for the construction of a railroad was prevented; and held, in an opinion by Mr. Justice Brewer, that "it has been repeatedly held that, if one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer." This decision and the principle so announced, has been expressly upheld in later decisions. *Bitterman* v. *Louisville & N. R. Co.*, 207 U. S. 205, 223, 28 Sup. Ct. 91. Mr. Justice Hughes, in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, 394, 31 Sup. Ct. 376, summarizes the principle of the Federal court in this terse form: "The complainant invokes the established doctrine that an actionable wrong is committed by one who maliciously interferes with a contract between two parties and induces one of them to break that contract to the injury of the other." The sense in which maliciously is used by this court is expressed in *Bitterman* v. *Louisville & N. R. Co.*, 207 U. S. 205, 223, 28 Sup. Ct. 91: "It is not necessary that the ingredient of actual malice in the sense of personal ill will should exist to bring this controversy within the doctrine of the *Angle Case*. The wanton disregard of the rights of a carrier causing injury to it, which the business . . .

involved, constitutes legal malice within the doctrine of the *Angle Case.*" See also *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 38 Sup. Ct. 65.

The principle of these cases has often been affirmed and its reach and limitation determined by the Massachusetts court. In *Martell* v. *White,* 185 Mass. 255, 258, 69 N. E. 1085, the defendant association was coerced into refusing to trade with plaintiff. The court expressed its position with clearness: "In a case like this," it said, "where the injury is intentionally inflicted, the crucial question is whether there is justifiable cause for the act. If the injury be inflicted without just cause or excuse, then it is actionable. . . . But from the very nature of the case it is manifest that the right of competition furnishes no justification for an act done by the use of means which in their nature are in violation of the principle upon which it rests." In an action on the case for a breach of plaintiff's contract of employment, the court, in *Berry* v. *Donovan,* 188 Mass. 353, 355, 74 N. E. 603, declared: "The primary right of the plaintiff to have the benefit of his contract and to remain undisturbed in the performance of it is universally recognized. . . . Such a right can lawfully be interfered with only by one who is acting in the exercise of an equal or superior right which comes in conflict with the other. An intentional interference with such a right, without lawful justification, is malicious in law, even if it is from good motives and without express malice." This interpretation of malicious is approved in *Beekman* v. *Marsters,* 195 Mass. 205, 212, 80 N. E. 817; *McGurk* v. *Cronenwett,* 199 Mass. 457, 461, 85 N. E. 576; *Lamb* v. *Cheney & Son,* 227 N. Y. 418, 421, 125 N. E. 817.

A number of cases of like doctrine will be found cited in the notes in Annotated Cases, 1916E, p. 608, *id.* 1912B, p. 1162, and Vol. 11, Amer. & Eng. Anno.

Cases, p. 337. Valuable discussions of this subject will be found in an article on *Lumley* v. *Gye*, by Mr. Schofield in 2 Harvard Law Review, 19; and in Chapter 7 of Bigelow on Torts (8th Ed.), is an illuminating discussion of the entire subject.

The term "malicious" in this connection has been called a mere title and this designation seems apposite. Its use always occasions question and requires definition and explanation. For this reason we incline to agree with Lord James when he says, in his opinion in *South Wales Miners Federation* v. *Glamorgan Coal Co., Ltd.*, L. R. (1905) App. Cas. 239, 255: "But when all that is meant by malice is an intention to commit an unlawful act without reference to spite or ill-feeling, it is better to drop the word malice and so avoid all misunderstanding"; and plaintiff in this case probably for this reason substitutes in its complaint in place of maliciously the words "wilfully and knowingly."

We adopted, in substance, the principle of these authorities in *Connors* v. *Connolly*, 86 Conn. 641, 86 Atl. 600, which was an action to recover damages for a conspiracy to secure plaintiff's discharge, in these words: "The undisputed facts disclose that the plaintiff suffered damage in the loss of his employment, and that this damage was intentionally caused. These facts shown, a prima facie cause of action was made out against those who, thus acting with intent, caused the damage. Recovery, however, might be defeated by the establishment by those persons of a justification, the burden being upon them to do so."

As a result of the breaching of plaintiff's contracts with McLachlan it has suffered a loss of $5,139.75.

There is error as to Green, Lawlor, Sculley and O'Hara, the judgment as to them is reversed, and the Superior Court is ordered to enter its judgment for $5,139.75, with interest from January 1st, 1920, against

defendants Green, Lawlor, Sculley and O'Hara; as to the other defendants there is no error.

In this opinion CURTIS and BURPEE, Js., concurred. GAGER, J., concurred in the result, but died before the opinion was written.

BEACH, J. (dissenting). If the defendants named in the rescript had acted for their personal benefit, and without any better justification than their own rights as individuals to induce McLachlan to break his contract with the plaintiff, I should concur. But in fact they are officers of a trades union comprising makers and finishers of hats, and as such they represented their union finishers who were short of work, and for whose benefit they acted, and they also represented the right of the union makers employed at McLachlan's shop to induce him to give priority of deliveries to union finishing shops.

It seems to me that the fundamental question in the case is whether these union makers had a right to "induce" McLachlan to give priority of deliveries to the shops where their fellow-unionists were employed and in need of work. Practically speaking, McLachlan yielded because of the fear of a contest with the United Hatters, and the prospect of a strike in the background; and the question may be tested by inquiry whether the makers employed in his shop had a legal right to strike in order to compel him to give priority in deliveries to union finishing shops. It must be conceded that if McLachlan had not been under contract to make deliveries elsewhere, the joint interests of the makers and finishers and their joint membership in the United Hatters would have justified such a strike, and the next question is whether the existence of such a contract, coupled with the knowledge of it, takes away the

legal right to strike for the purpose stated. I think not, because the duty to refrain from inducing one party to break his contract with the other is purely passive. In the Hohfeldian terminology it is a "no-right" rather than a "duty."

A stranger to a contract may not, for his own benefit and without legal justification, knowingly induce a breach of it, but he is not bound to assist in its performance. And so the union makers employed in McLachlan's shop were not bound, in the absence of such an agreement on their part, to continue to make hats in order that the plaintiff might remain undisturbed in the enjoyment of its contract with their employer. Although they knew of the contract, they might strike for any reason for which they might lawfully strike in the absence of such a contract. Otherwise, employers of labor could extinguish the possibility of lawful strikes by posting notices of their outstanding contract obligations.

And since the makers themselves could lawfully strike to compel McLachlan to give priority in deliveries to union finishing shops, whether they knew of his contract with the plaintiff or not, it follows that their representatives could lawfully induce McLachlan to do so, whether they knew of the contract or not.

For this reason it seems clear to me that the defendants' right to induce McLachlan to give priority in deliveries to union finishing shops was in law equal to the plaintiff's right of property in his contract; and I feel compelled to dissent.