Annette **HEYMAN**, Individually, Annette
Heyman, as Executrix of the Estate of
Lazarus S. Heyman, late of Danbury,
and Prudential Management Company,
a Connecticut corporation, Plaintiffs,

v.

Robert S. **KLINE**, Defendant.

Civ. No. B–12

Master's Report.

United States District Court,
D. Connecticut.

Sept. 21, 1970.

See also D.C., 344 F.Supp. 1081; 344
F.Supp. 1088; 344 F.Supp. 1118.

Jon O. Newman, Hartford, Conn., for plaintiffs.

John R. Bush, of MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., William B. Rush, of Pullman, Comley, Bradley & Reeves, and Thomas J. Dolan, of Coles, O'Connell & Dolan, Bridgeport, Conn., for defendant.

## ORDER ADOPTING SPECIAL MASTER'S REPORT

TIMBERS, Chief Judge.

The following Special Master's report is hereby adopted by the Court, no objections having been filed as provided by Rule 53(e) (2), Fed.R.Civ.P., and full opportunity having been afforded to counsel to be heard in open court on September 21, 1970:

TO THE HONORABLE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT:

The above-entitled cause was referred to me as Special Master by an order of reference dated June 26, 1970, directing me to hear and report the amount of damages plaintiffs are entitled to recover from defendant, including, without limitation, expenses wrongfully charged by defendant to plaintiffs, that portion of his salary and expenses paid by plaintiffs while defendant was not faithfully performing his employment obligations; and damages sustained by plaintiffs as a result of defendant's causing employees to leave and his impairment of business relations with tenants.

Having heard the evidence, in the presence of the parties and their counsel, and having reviewed the entire transcript of the evidence adduced at the prior trial on the question of liability and the respective briefs for both parties, I herein make my finding of fact, opinion and conclusions of law on the issue of damages.

I

*Findings of Fact*

1. The findings of fact of this Court contained in its memorandum of decision dated June 26, 1970, 344 F.Supp. 1088, 1094–95, paragraphs (D) (23) (a) through (D) (23) (k), are hereby incorporated by reference as findings of fact for the purpose of this report.

2. The findings of fact of this Court contained in its memorandum of decision dated June 26, 1970, 344 F.Supp. 1088, 1095–97, paragraphs (E) (24) (a) through (E) (24) (n), are hereby incorporated by reference as findings of fact for the purpose of this report.

3. The contracts of employment in question here do not provide for apportionment of compensation to periods of time or compensation apportioned to the completion of specified items of work.

4. The employment contracts of defendant with plaintiffs, besides calling for a per annum salary, included as compensation, at various times during the terms of the contract, the use of a leased automobile, reimbursement of reasonable, necessary and ordinary business expenses incurred pursuant to his employment, and his personal living expenses.

5. Defendant's breach of his employment contracts with plaintiffs was substantially continuous from their inception in March 1968 to the time of defendant's discharge in January 1969.

6. The conduct of defendant in materially breaching his employment contracts with plaintiffs included a breach of his duty of loyalty to plaintiffs.

7. The conduct of defendant in materially breaching his employment contracts with plaintiffs was willful and deliberate.

8. The breach by defendant of his employment contracts in their material respects was not known to plaintiffs prior to defendant's discharge.

9. The gross salary paid to defendant by plaintiffs during defendant's employment totaled $19,999.97 and was compensation to defendant.

10. The claims of defendant for expenses, fraudulently presented by defendant, and for which he was reimbursed by plaintiffs, total $775.00 and fraudulently received by defendant as compensation.

11. Expenses of $295.18 for the week ending December 11, 1968, and paid by plaintiffs, were incurred by defendant in violation of Mr. Samuel Heyman's instructions and were excessive.

12. Commencing April 18, 1968, through August 19, 1968, plaintiffs spent $1,413.30 for the personal air travel of defendant and was compensation to defendant.

13. Commencing May 15, 1968 through the month of January 1969, plaintiffs spent $2,063.26 for the personal car rental of defendant and was compensation to defendant.

14. Commencing June 13, 1968 through September 2, 1968, plaintiffs spent $905.87 for defendant's personal living expenses and was compensation to defendant.

15. During the course of defendant's employment contracts with plaintiffs, plaintiffs paid $3,017.84 directly to or on behalf of defendant for business related expenses including air travel and car rental and was not compensation to defendant.

16. Defendant, by deliberately causing the resignation of four employees of plaintiffs, created the necessity for plaintiffs to hire two replacements at a cost of $688.80 in employment agency fees.

17. Plaintiffs entered into a severance pay agreement for $1,800.00 with Eva Lambert, one of the employees who resigned because of defendant's conduct.

18. While there was some evidence that this severance pay was made because Eva Lambert was treated badly by defendant, the severance pay arrangement was made partly in resolution of a claim for overtime pay and primarily

in recognition of Eva Lambert's past loyal services to the late Lazarus Heyman.

19. Defendant, on numerous occasions during his employment with plaintiffs, abused plaintiffs' tenants; dealt with clients in a very high-handed and arrogant manner; some tenants refused to see defendant, to do business with him and refused to speak to him; a great number of tenants found the defendant to be insulting and arrogant; defendant on one occasion created a situation whereby a tenant had to retain an attorney to replace a furnace in one of plaintiffs' stores when the lease clearly placed the burden on plaintiff for such replacement.

20. Defendant's conduct toward the tenants of plaintiffs created a bad public relations impression with tenants particularly in the transition period between the death of Lazarus Heyman and the full time attention of Samuel Heyman to plaintiffs' business.

21. Plaintiffs' business interest was dependent, to a great extent, upon a cordial relationship with their tenants and their ability to retain tenants and attract new tenants.

22. There is no evidence of special monetary damages due to defendant's course of abusive conduct with tenants of plaintiffs.

23. The deliberate actions of defendant in abusing tenants of plaintiffs, requesting a bank used by plaintiffs to perform a fraudulent act, were intentional doing of harmful acts without legal, social justification or excuse and resulted in the impairment of plaintiffs' good will.

24. Defendant's conduct, in deliberately causing the resignation of four of plaintiffs' employees, caused upset in the plaintiffs' business affairs, required the hiring and training of two new employees with the attendant disruption of plaintiffs' business affairs.

25. Plaintiffs, on at least one occasion, had to pay a higher interest rate than usual to the Fairfield Trust Co. on a short term loan but such interest rate was more probably due to a prevailing tight money market and the location of the building where the money was to be invested rather than the conduct of defendant as described in the Court's memorandum of decision dated June 26, 1970, (D) (23) (C).

## II

### *Opinion*

### a. *Restitution of Salary and Expenses*

The general rule as to the recovery by an employer of compensation previously paid to an employee is reflected in the Restatement (Second) of Agency, §§ 469 and 456 (1957). Section 469 states:

> "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."

That same section, under comment (e), indicates that the employer may maintain an action to recover compensation paid in ignorance of the agent's faulty conduct.

The Restatement makes a further refinement of the above rule in comments (b) and (c) to section 456 as follows:

> "b. Apportioned services. If an agent is paid a salary apportioned to periods of time, or compensation apportioned to the completion of specified items of work, he is entitled to receive the stipulated compensation for periods or items properly completed before his renunciation or discharge. This is true even if, because of unfaithfulness or insubordination, the agent forfeits his compensation for subsequent periods or items.
>
> c. Unapportioned services. If the agent has rendered services, compensation for which is not apportioned in the contract of service, and his re-

nunciation or other breach of contract is not wilful, he is entitled to an amount equal to the fair value of his services, not exceeding the agreed compensation, minus any damage caused to the principal by his breach of contract. A breach of contract is wilful and deliberate, as those words are herein used, only when the agent, in complete disregard of his contractual obligations, fails to perform or misperforms the promised services and has no substantial moral excuse for so doing, or is guilty of disloyal or grossly insubordinate conduct."

The Connecticut decisions have not concerned themselves with the recovery by an employer of compensation already paid to an employee. The general rule concerning the right of an employee to recover compensation, which is really the other side of the same coin, has been stated by the Connecticut Supreme Court as follows:

"It has long been the law of this state that in contracts of hiring there is an implied condition that the servant will perform the duties incident to his employment honestly, and will do nothing injurious to his employer's interest, and if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all right to compensation."

Breen v. Larson College, 137 Conn. 152, 157, 75 A.2d 39, 42 (1950); Phoenix Mut. Life Ins. Co. v. Holloway, 51 Conn. 310, 314 (1883).

The right to recovery by the employer is clearly set forth in Harry R. Defler Corp. v. Kleeman, 243 N.Y.S.2d 930 (1963) as follows:

"An employee whose actions are disloyal to the interests of his employer forfeits his right to compensation for services rendered by him (citation omitted) and if he is paid without knowledge of his disloyalty he may be compelled to return what he has improperly received (citations omitted)."

Harry R. Defler Corp. v. Kleeman, *supra* at 938. (also allowing recovery for expenses improperly charged).

Defendant contends that he accomplished the primary purpose of his employment and that as late as December 1968 plaintiffs felt that Kline was adequately performing his contract. Support for that position is sought in the following proposition from Williston:

"If the default is so slight as not to justify discharge, or if, though sufficiently serious to justify discharge, the employer with knowledge of the facts nevertheless continues the employment, the employee is entitled to the agreed compensation. . . ."

4 Williston, Contracts § 1028 (Rev. ed. 1936).

The reliance by defendant on that proposition is clearly misplaced. The material breach of the employment contracts by defendant consisted in part of a series of fraudulent acts in submitting expense vouchers, substantial antagonism of tenants, a request to plaintiffs' banker to write a fraudulent letter, unauthorized rifling of plaintiffs' personal files, carrying on a real estate brokerage business which was not part of plaintiffs' business and deliberately causing plaintiffs' employees to resign. This catalog of events is substantially over and above a "slight default". There is, further, no evidence to support a conclusion that plaintiffs continued defendant's employment with knowledge of the material breach recited above.

The decisions relied upon by defendant, even though denying the employer recovery of compensation, recognize that the presence of fraud, among other grounds, may allow recovery back of a voluntary payment of wages by the employer. Joseph Toker, Inc. v. Cohen, 169 A.2d 838, 844–45, 67 N.J.Super. 68, 80–82 (1961). The court, on the facts there, found that there was an insufficient basis to establish fraud or bad faith on the part of the employee as would deprive him of his right to compensation for the services he had rendered. There is ample evidence in this case to establish fraud and bad faith on the part of defendant.

■■ On the basis of the test outlined in Sections 469 and 456 of the Restatement of Agency, the plaintiffs should recover all compensation given to defendant within the terms of the various employment contracts.

The term "compensation" has not been judicially limited under cases determining the right of the employer to recover from the employee who has materially breached his employment contract. "Compensation" certainly includes wages, bonus, profit-sharing. Annot., 88 A.L.R.2d 1437, 1440, 1449 (1963). The decisions have focused on money paid to or spent directly for the benefit of the employee. I would therefore find, under the circumstances of this case, that the "compensation" to be recovered by plaintiffs include salary to defendant of $19,999.97, fraudulent expenses of $775.00, excessive expenses of $295.18, personal living expenses of $905.87, defendant's personal air travel expenses of $1,413.30 and defendant's personal car rental expenses of $2,063.26.

b. *Tortious Interference with Contract Relations*

The deliberate actions of defendant in causing employees of plaintiffs to resign has raised the issue of damages for such action as a tortious interference with contract relations.

■■ The general rule is that a person who maliciously causes an employee in the actual service of an employer to quit his service, to the injury of the employer, is liable in damages to the employer for such injuries as naturally result from the loss of the employee. Restatement of Torts § 766 (1939); 84 A.L.R. 43, 77, supplemented in 26 A.L.R. 2d 1227, 1238, § 2 (1952); 45 Am.Jur.2d, Interference § 46. The malice involved here is legal malice, that is, the willful violation of a known right. R and W Hat Shop, Inc. v. Sculley, 98 Conn. 1, 16–18, 118 A. 55, 60–61 (1922).

■■ The evidence in this case clearly supports a finding that the resignation of four employees of plaintiffs was due solely to the deliberate and malicious conduct of defendant. There is also evidence that special damages in the amount of $688.80 in employment agency fees were incurred by plaintiffs. The hiring of new personnel, training them in their new positions, also resulted in the disruption of plaintiffs' business affairs.

The measure of damages to the employer is not limited to recovery for the loss of services but he is entitled to all damages resulting from the wrongful act. 45 Am.Jur.2d, Interference § 59. I find that plaintiffs should be awarded $5,-000.00 including the above special damage as compensation for defendant's tortious interference with contract relations of plaintiffs.

c. *Interference with Business Relations*

■ From the evidence adduced, it is abundantly clear that the actions of defendant, in his dealings with tenants of plaintiffs and other third parties, damaged the good will of plaintiffs' business affairs, particularly during the aftermath of the death of Lazarus Heyman who had personally created the good will and reputation of the plaintiffs. It was clearly a period when tenants and other business relationships were waiting to see the manner in which the business of plaintiffs would be continued. There has been no claim made by plaintiffs as to the loss of any tangible property or specified monetary losses through the impairment of good will of plaintiffs. The failure of producing such specific monetary losses does not defeat plaintiffs' claim for compensation for tortious interference with business relations. In Seidell v. Taylor, 151 P. 41, 86 Wash. 645 (1915), the court states:

"In the trial of the case and in its instructions given to the jury, the court in effect confined respondents' measure of damage to loss of the good will of their business. It is not claimed that they lost any tangible property. That the good will was at the time of very substantial value, and that it was lost because of appellants' willful, wrongful act, as alleged in their complaint, was abundantly proven by the

evidence. It is contended that the evidence wholly failed to show the value of the good will. The evidence showed the manner of carrying on the business, its receipts, expenses, and profits for some time prior to the assault in considerable detail. While the value of the good will cannot be measured thereby with any great degree of exactness, we are to remember that it was caused by a malicious willful act of appellants, and that in such case damages need not be measured with any degree of nicety, as said by Chief Justice Johnson in Burckhardt v. Burckhardt, 42 Ohio St. 474, 499, 51 Am.Rep. 842:

'Where there is fraud or other intentional wrong, there is not the same strictness to exclude, remote or uncertain damages, even though punitive damages are not involved. We think the case at bar one of willful wrong, and that the language of Christancy, J., in Allison v. Chandler, 11 Mich. 552, is applicable. He says: "The nature of the case is such as the wrongdoer has chosen to make it; and, upon every consideration of justice, he is the party who should be made to sustain all the risk of loss which may arise from the uncertainty pertaining to the nature of the case and the difficulty of accurately estimating the results of his own wrongful act." ' "

Seidell v. Taylor, *supra* at 43.

While tortious damage to good will clearly appears to be compensable, there are no Connecticut decisions squarely on point. The Connecticut approach to the recovery of damages for a tortious interference resulting in lost profits is helpful in ascertaining the certainty that damage has occurred.

"We, in this state, recognize that a cause of action does exist for unlawful interference with business and that it is not essential to that cause of action that it appear that the tort has resulted in a breach of contract to the detriment of the plaintiff. Wyeman v. Deady, 79 Conn. 414, 65 A. 129 (1909); Skene v. Carayanis, 103 Conn. 708,

131 A. 497 (1925). As we said in the Skene case (p. 714), "The law does not, however, restrict its protection to rights resting upon completed contracts, but it also forbids unjustifiable interferences with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry. Full, fair and free competition is necessary to the economic life of a community, but under its guise, no man can by unlawful means prevent another from obtaining the fruits of his labor.

It does not follow from this, however, that a plaintiff may recover for an interference with a mere possibility of his making a profit. On the contrary, wherever such a cause of action as this is recognized, it is held that the tort is not complete unless there has been actual damage suffered. Pollock, Torts (14th Ed.), p. 441; Winfield, Law of Tort (2d Ed.), p. 643; Prosser, Torts, pp. 1016 et seq."

Goldman v. Feinberg, 130 Conn. 671, 674–75, 37 A.2d 355, 356 (1944).

It is clear from the *Seidell* decision, *supra*, that the certainty of damage must be established, but that the certainty of damage is less strict where the act complained of is wrongful. Support for the rationale of *Seidell* and the diminishing certainty of damage required in proportion to the wrongfulness of the act committed is commented upon by Professor McCormick as follows:

"It is useful to attempt, as we have attempted in this chapter, to isolate for separate inspection, as a recurrent phase of damage litigation in general, the problem of ascertainability of the amount of loss. The development of the standard of certainty of amount is probably the most distinctive contribution of the American courts to the common law of damages. Moreover, the doctrines of certainty form perhaps the most important and characteristic part of the law of damages, in its proper sense of the rules and practices governing the measurement of awards, as contrasted with the law

of liability. However, just as every attempt to classify and discuss cases according to factual kinship roils the clear pool of doctrine, so the attempt herein to classify and treat them together because of doctrinal affinity under the standard of certainty may falsify the picture of what the courts are doing, by suggesting an illusory consistency to a single standard in the medley of litigated cases. Consequently, we must remind ourselves that, though the verbal terms of the standard of certainty may be repeated in like language, yet the actual use of it varies in the different classes of cases, and within the classes varies with the slant of the balance of sympathy, justice, and equity in the particular case. It is applied with relative strictness in cases of routine breach of contract, relaxed somewhat if the breach was avoidable and deliberate, relaxed again in torts to property according to the wantonness of the act, applied still more loosely in personal injuries, and becomes shadowy, almost to vanishing, in cases of malicious wrongs. In the tort field, it has in fact no application at all to the measurement of damages to interests of personality, such as claims for pain, mental anguish, or humiliation, nor, of course, to punitive damages.

Despite this close dependency of the length of the yardstick of certainty upon the type of the harm to be measured, these two phases of a case—responsibility and ascertainability of amount—should be distinguished.

McCormick, Damages §§ 26–27 (1935).

I find that the plaintiffs should recover $10,000.00 as damages for defendant's tortious interference with plaintiffs' business relations.

## III

### Conclusions of Law

1. Defendant breached his contractual employment obligations to plaintiffs in material respects causing damage to plaintiffs thereby.

2. Defendant tortiously interfered with the contractual relations of plaintiffs causing damage to plaintiffs thereby.

3. Defendant tortiously interfered with the business relations of plaintiffs causing damage to plaintiffs thereby.

4. Plaintiffs have not sustained their burden of proof as to the proximate cause of the severance pay agreement with Eva Lambert.

5. Plaintiffs are entitled to money damages on the issues of damages heard by the Special Master.

## IV

### Conclusion

I recommend that judgment be granted in accordance with this report and that plaintiffs be awarded damages in the aggregate of $40,452.58.*

Dated at New Haven, Connecticut, the 10th day of August, 1970.

(s) Thomas D. Clifford
Thomas D. Clifford
Special Master

---

* Judgment for plaintiffs subsequently was entered on September 30, 1970 in amount of $30,605.53, representing $40,452.58 damages as determined by the Special Master, less $13,591.62 previously paid by defendant to plaintiff Annette Heyman, plus $3,744.57 expenses incurred by plaintiffs as result of contempt committed by defendant and his attorneys.