[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff landlord brings this action against the defendant Gun Rack Ltd. seeking damages for the breach of a commercial lease. He also seeks damages from the individual defendants as guarantors of a portion of the rent claimed unpaid. The defendants filed three special defenses and a counterclaim in four counts.
The court finds the facts which follow. The plaintiff owner and the defendant Gun Rack Ltd. entered into a commercial lease agreement on or about November 21, 1988 for the rental of 1735 square feet at 1757 Black Rock Turnpike, Fairfield. The term of the lease was 3 years from January 7, 1989 to January 7, 1992. The base rent was $20 per square foot. Additional rent included a portion of CT Page 9095 utility expenses. The business use of the premises was as a "firearm shop."
On December 14, 1988 the parties signed an Amendment to Lease. The landlord was erroneously described as Andover Group, Inc. The plaintiff, who is the President of Andover Group, Inc. signed in his individual capacity rather than his corporate capacity. The corporate defendant signed through its President, Robin Carroll. The individual defendants signed as guarantors. The corporate defendant paid rent as called for in the lease amendment through April 1991.
The premises consisted of a portion of one floor in the building. The Gun Rack leased almost one-half the right front side of the upper floor, there being an additional area of the right side not used by the defendant. Dr. Carroll had decided not to rent that portion of the space and a partition had been erected. The mode control to the HVAC unit which supplied heat, ventilation and air conditioning to that area and the Gun Rack, was located in that untenanted area. To get to the mode control the individual defendants had to cross the hall from their store and enter the other space through a door to which they had a key. Thus they had unlimited access to the control through the summer of 1989. When Spa Lady, the other tenant on their floor, vacated, Mr. Nemeth opened New Dimensions, another women's health and fitness facility in that space in June 1989 and eventually took over the space where the mode control unit was located.
In the summer of 1989 the defendants experienced difficulty with the amount of air cooling and air exchange available to them but they resolved the matter by manually adjusting the mode control. During their tenancy the defendants added inventory and lighted display cases. These lights gave off enough heat to affect the interior temperature in the store. When the lease was negotiated, however, the individual defendants had made no mention of their lighting requirements, which exceeded those of a typical retail establishment. Mr. Nemeth was unaware of a potential problem. Therefore, the lease contained no provision concerning standards for determining adequate levels of air conditioning or air exchange for the Gun Rack. The defendants accepted the premises with the existing HVAC unit.
In September 1989 there was sufficient tension between the parties that the plaintiff suggested arbitration as a means to resolve the dispute and Dr. Carroll agreed; however this plan came to nought. CT Page 9096
In late 1989-early 1990 the parties discussed the purchase of an interest in the building by Dr. Carroll. These talks collapsed when Dr. Carroll learned that the plaintiff had defaulted on his mortgage to People's Bank. In March the defendants were served with a letter from bank counsel instructing them to forward all rent payments to the bank pursuant to an assignment of rents. Gun Rack directed payments to the bank for three months until the plaintiff resolved the situation; then it resumed payment to the landlord.
Mr. Nemeth limited the defendants' accessibility to the control panel in May 1990 by changing the lock to the door across the hall, a move the defendants believed taken in retaliation for their having paid rent to the bank. By this time New Dimensions occupied that portion of the building where the control was. As a result the defendants experienced temperatures in the store which they considered too high for their comfort and for the safety of their inventory.
When the defendants wished to adjust the control they had to ask the plaintiff or his wife. They made repeated requests of them for more air circulation or cooler air. The plaintiff "usually" turned the system on, although not apparently for sufficient time to satisfy the defendants. In May 1990, Mr. Nemeth and Dr. Carroll had an acrimonious exchange in which Dr. Carroll issued an ultimatum regarding the temperature in the store. On June 1, 1990 the individual defendants wrote to Mr. Nemeth demanding that the situation be rectified immediately. Throughout the summer of 1990 the premises were uncomfortably hot. The defendants reported their complaints almost on a daily basis.
Before October 30, Mr. Nemeth suggested a schedule for providing the defendants with ventilation from 1 to 5 p.m. The defendants responded by writing to their attorney at the time, John Blank, that they wanted "no compromise." Much time was spent at trial determining the source of the "no compromise" language. Mr. Melson acknowledged authorship of the letter and signed Dr. Carroll's name. Dr. Carroll testified that he was seeing the document for the first time in court. The court was unconvinced by this assertion. However, Dr. Carroll "basically" agreed with the contents of the letter although he was evasive in responding to a question as to authorizing it. The letter demanded 24-hour access to the HVAC control panel and stated that there was no air conditioning or ventilation.
CT Page 9097 On advice of counsel, the defendants compiled a daily list of indoor and outdoor temperatures for the period of September 26 through October 3. In November 1990 the Gun Rack brought suit against the plaintiff (Gun Rack v. Nemeth, docket no. 9011-01137). It alleged, inter alia, a breach of the lease agreement, a violation of Connecticut General Statutes 42-110a et seq. and claimed damages, and an apportionment of utility costs and an order the defendant provide air conditioning and ventilation. The defendant filed an appearance. No further steps were taken by the plaintiff until the suit was withdrawn on May 8, 1991. The withdrawal corresponded with the approximate date Gun Rack vacated the premises
Dr. Carroll and the general manager of Gun Rack had visited five locations before entering a lease for the premises presently leased by Gun Rack. The issue of air conditioning, ventilation and interior temperatures was specifically negotiated by Dr. Carroll and the new landlord, Mr. Grella, and included in the new lease. The system in Mr. Grella's premises was upgraded at the defendants' expense.
After the defendants vacated the premises in May 1990 the plaintiff filed this action.
The plaintiff claims that the corporate tenant owes the balance of the rent due for the term of the lease and that the individual defendants are responsible for a portion of that amount as guarantors. The plaintiff also alleges that Dr. Carroll tortiously interfered in the contract between the landlord and the corporate tenant. The court finds for the plaintiff on the first and third counts of the amended complaint.
The corporate defendant breached the lease by vacating before the termination of the lease. When it failed to pay the rent due, the individual defendants became liable for the portion of the rent for which they had guaranteed payment in the lease amendment. They contend that they are not bound by this document. They cite as their reason the fact that the lessor is the Andover Group, Inc. and not Anton E. Nemeth. Andover Group, Inc. was not the lessor in the original lease; however, Mr. Nemeth is President of the corporation. He could give no reason other than carelessness in the preparation of the lease amendment for the error in the lessor's name. Nevertheless, the fact remains that the defendants executed the amendment, Mrs. Carroll as President of Gun Rack and individually, and Dr. Carroll individually. Subsequent to its execution, the rent paid was the rent called for in the amendment. The amendment CT Page 9098 benefitted [benefited] the tenant by reducing the rent for a period of time. The original lease called for $34,700 or $20 per square foot on 1735 square feet of space. It was modified to $15 per square foot for six months and then to $20 per square foot calculated on the basis of 1400 square feet. The 335 square feet not included in this computation was to be charged to the tenant in the third year. The lease amendment was in writing and signed by the parties to be charged. Gen. Stat. Sec. 52-550(a) (4). The court finds the lease amendment valid.
The defendants, as individuals, guaranteed the payment of the rent due in year three. To guarantee payment of rent is to undertake to pay a debt of rent due in case of the failure of the tenant occupant primarily liable for such payment. Wolf v. Carden, 30 Conn. Sup. 507,512. Dr. and Mrs. Carroll did not challenge the genuineness of the signatures, nor allege any fraud or misrepresentation inducing them to sign. They are bound by the guarantee. The court finds for the plaintiff on counts 1 and 3.
In their special defenses and counterclaim the defendants state that the landlord breached the lease by not providing adequate air conditioning and ventilation, thereby constructively evicting the corporate tenant and causing it to rescind the lease.
There was no standard set forth in the lease to describe the level of air cooling and air exchange for the premises. The landlord had no prior knowledge that the tenant's lighting requirements would cause excessive heat in the unit. There was no lease provision for him to breach. The court finds for the plaintiff on the first count of the counterclaim.
The defendants allege that they were constructively evicted. because the landlord prevented them from having access to the mode control. Proof of a constructive eviction requires that the lessor be at fault; that "`while not actually depriving the tenant of possession of any part of the premises leased, he "`has done or suffered some act by which the premises are rendered untenantable.'" Cerruti v. Burdick, 130 Conn. 284, 286; Thomas v. Roper, 162 Conn. 343, 349.
Although Mr. Nemeth had given Dr. and Mrs. Carroll access to the mode control, it was located in space they did not want to lease and had partitioned off. They should have foreseen, however, that the space would be tenanted and their direct contact affected.
They were aware that the front windows were stationery and CT Page 9099 large so that sun poured through them while other windows did not open. The interior temperatures of the Gun Rack during the period the defendants were keeping a record in September-October 1990 did not greatly exceed those temperatures which were negotiated by them later in the lease with Mr. Grella. Although the landlord's method of denying direct access to the control is not commendable, it does not rise to the level of constructive eviction.
The fact that the defendants remained in the subject space undercuts their claim of untenantability. In Conaway v. Prestia,191 Conn. 484, 493-494, the Connecticut Supreme Court said "(I)t is axiomatic that a claimant seeking damages bears the burden of proving, with reasonable certainty, those damages sustained as a result of his injury." Although they were uncomfortable, the defendants failed to prove that they lost customers or profits or suffered damage to the inventory. They offered no evidence as to the proper degree of temperature for the safe storage of firearms and ammunition.
The timing of the breach makes the Carrolls' motives suspect. They were about to enter the third year in which the rent would be increased. They were individually liable on a portion of the rent in that year. They moved into premises that had less space and was less costly. Although they had explored the possibility of adding another HVAC unit and had assented to arbitration, they did not pursue either of these alternatives before starting the November 1990 lawsuit. They did not aggressively follow through the pretrial stages of that suit to determine their rights. Terrifying, the individual defendants were at times vague, evasive, or hesitant in that they could not recall certain events or conversations. They were unconvincing in their characterization of their motives. The court finds for the plaintiff on the third count of the counterclaim.
The defendants also claimed tortious interference by the landlord which caused a decline in business, and a claim that the landlord violated General Statutes section 42-110a. They presented no proof of any loss of business. The landlord did not violate the Connecticut Unfair Trade Practices act as he did not constructively evict them. He did not engage in any unfair or deceptive trade practice.
The plaintiff urges the court to find that the defendant Robert Carroll tortiously interfered with his contract with Gun Rack, Ltd. The essential elements of this cause of action are that there be a contractual relationship between the plaintiff and another; that the CT Page 9100 defendant, knowing that relationship intentionally interferes with it; and that the plaintiff claims to suffer actual loss. Harry A. Finman Son, Inc. v. Connecticut Truck and Trailer Service Co.,169 Conn. 407, 415.
In Murray v. Bridgeport Hospital, 40 Conn. Sup. 56, at 61, the court stated that a corporate officer, director or stockholder would be liable in tort if motivated by personal gain or personal feelings against the third party. However, lack of justification, or privilege, is a condition precedent to liability. A privileged interference can be for the protection of the defendant's own economic interests. W. Prosser, The Law of Torts, 4th ed. 1971, sec. 129 at 944. In R W Hat Shop, Inc. v. Sculley, 98 Conn. 1, 13, the court stated that where one who acts under an equal or superior right causes such injury he will not be liable for the resulting damage. There can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract. Multi-Service Contractors, Inc. v. Vernon, 193 Conn. 446, 451.
Dr. Carroll was an officer, shareholder and director of this closed corporation. He raised the defense of justification in his trial brief and bore the burden of establishing such justification. R and W Hat Shop, Inc. v. Scully, at 18; Harry A. Finman and Son. Inc. v. Connecticut Truck and Tile Service Co., Id. at 415. Dr. Carroll met his burden. He sought to save money by moving to a smaller space at a lesser rent and sought to guarantee the comfort of himself and the employees and customers of Gun Rack Ltd. He apparently believed that the temperatures he experienced at the subject premises imperiled the inventory. He made a business decision for the corporation with which he was inextricably linked. The plaintiff cannot prevail on count 4.
A lease is a contract. Robinson v. Weitz, 171 Conn. 545, 551 In a contract action the measure of damages is that the award shall place the injured party in the same position as he would have been in had the contract been fully performed. Lar-Rob Bus Corp. v. Fairfield, 170 Conn. 397, 404-405. Unpaid rent may be used by the court in computing the losses suffered by the plaintiff by reason of the defendant's breach of the lease. The plaintiff is entitled to recover the damages which naturally flow from such a breach. Sagamore Corporation v. Willcutt, 120 Conn. 315, 320. The amount of rent agreed to by the parties is a proper measure of damages. Rokalor, Inc. v. Connecticut Eating Enterprises, Inc. 18 Conn. App. 384,390. The court in Rokalor said that when the lessee breaches a commercial lease, the lessor has two options: (1) to terminate the CT Page 9101 tenancy; or (2) to refuse to accept the surrender. When the landlord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease and is under no duty to mitigate damages.
On May 21, 1991, Mr. Nemeth made demand upon the corporate defendant for unpaid rent for May 1. He stated that he would terminate the lease by May 31 in the event the default was not, cured within 10 days and all back rent and all additional rent would become due. This step was taken pursuant to the lease.
Accordingly, the court finds that the corporate defendant owes a total of $34,644 in unpaid rent from May through December 1991. Additional rent for that period totals $8792.91. Robin and Robert Carroll, by reason or the guaranty, are liable for $17,336.99 of the total amount of $43,327.31. Interest is payable on the total sum at the legal aid from May 21, 1991 provides that the tenant shall be responsible for costs and attorney's fees incurred in the event of tenant's default. Absent contractual or statutory authorization, there can be no recovery, either as costs or damages, for the expenses of litigation or the expenditure for counsel fees by a party from his opponent. Buccino v. Cable Technology, Inc., 25 Conn. App. 676,679. The court finds that the plaintiff's counsel fees are reasonable and awards as counsel fees the sum of $20,737.50.
The plaintiff also seeks $7200 for restoring the premises. He submitted three estimates for proposed work. However, each estimate was prepared in June 1992 a full year after the defendant vacated. The installation of the carpets appears on two estimates and the court finds that the estimate from Carpet-Right Company is cumulative. The court finds that the plaintiff is entitled to recovery in the amount of $5500 in damages.
There was confusion regarding the amount held by the landlord as security. The evidence submitted was insufficient to outweigh the stated amount of security in the lease. Accordingly, the court finds that the security amounts to $5783.33 and shall be credited to the defendant.
Sandra Vilardi Leheny, J. CT Page 9101-A